IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| RODNEY BETHEA and<br>GENEVIEVE BETHEA, | )<br>)<br>) | |
| Plaintiffs, | )<br>)<br>) | |
| v. | )<br>) | Civ No. 11-1045-SLR |
| STATE OF DELAWARE, DELAWARE<br>STATE POLICE, CORPORAL GREG<br>RASH and CORPORAL HASSAN<br>GREENE, | )<br>)<br>)<br>)<br>)<br>) | |
| Defendants. | ) | |

Michael I. Silverman, Esquire of Silverman McDonald & Friedman, Wilmington, Delaware. Counsel for Plaintiffs. Of Counsel: Brian S. Chacker, Esquire of Gay Chacker and Mittin, P.C., of Philadelphia, Pennsylvania.

Michael E. McTaggart, Esquire, Deputy Attorney General, Delaware Department of Justice, Wilmington, Delaware. Counsel for Defendants.

**MEMORANDUM OPINION**

February 7, 2014
Wilmington, Delaware

ROBINSON, District Judge

## I. INTRODUCTION

On October 28, 2011, plaintiffs Rodney and Genevieve Bethea[1] filed this civil rights action pursuant to 42 U.S.C. § 1983 against defendants State of Delaware, Delaware State Police, Corporal Greg Rah and Corporal Hassan Greene, arising from an incident occurring on April 1, 2011. (D.I. 1) Plaintiffs allege violations of their rights under the Fourth and Fourteenth Amendments to be free from excessive force, false arrest, malicious prosecution, due process of law, and conspiracy. They also assert state law claims of assault, battery, mauling and punishment of plaintiff Rodney Bethea ("plaintiff husband").

Defendants filed their answer on April 2, 2012. (D.I. 11) Pursuant to a scheduling order, the parties pursued discovery, including depositions. (D.I. 12, 41) Plaintiffs have filed a motion for an extension of time to serve expert reports, which remains pending before the court. (D.I. 43)

On July 1, 2013, defendants moved for summary judgment. (D.I. 45) The matter is fully briefed. (D.I. 52, 53) The court has jurisdiction pursuant to 28 U.S.C. § 1331. For the reasons that follow, defendants' motion for summary judgment will be granted in part and denied in part.

## II. BACKGROUND

---

[1] In count five of the complaint, plaintiff Genevieve Bethea, wife of plaintiff Rodney Bethea ("plaintiff wife"), asserts a loss of consortium claim. (D.I. 1)

On the evening of March 31, 2011, Gillisa Bethea ("Gillisa")[2] went to the Pale Dog Bar, Newark, Delaware ("Pale Dog").[3] (D.I. 52 at A-22) While inside the Pale Dog, Gillisa encountered a friend from high school, Delisha Portluck ("Delisha"). After dancing for about an hour, Gillisa and Delisha were approached by two unknown men. While standing talking together, the men touched Gillisa's breast and vagina, without her permission ("the groping"). (*Id.* at A-22) When Gillisa rejected the groping, one man threw his drink on her. (*Id.* at A-22-23) Delisha responded by throwing her drink on one of the men. Next, an unknown woman charged toward Gillisa and pushed her. (*Id.* at A-23) A Pale Dog security officer ("bouncer") quickly intervened and removed Gillisa from the bar.

Delisha followed behind, leaving the Pale Dog to help her friend. (*Id.* at A-34) Delisha found Gillisa, crying hysterically and standing outside the front door of the Pale Dog. Together, they walked through the parking lot to Gillisa's car.[4] There, Gillisa called her parents to report the groping.

Plaintiff husband, 52 years old at the time, was asleep when his daughter called. Plaintiff wife awakened him with news of the groping. He dressed quickly and drove to the Pale Dog, approximately ten minutes away, to assist his daughter. (*Id.* at A-8)

---

[2]At the time of the incident, Gillia, plaintiffs' youngest daughter, was 23 years of age and resided with her parents. (D.I. 52 at A-20)

[3]According to a Pale Dog bouncer, the establishment had a reputation for having a lot of fights. (D.I. 52 at A-43) The Pale Dog was located in an L-shaped shopping center, with an adjacent parking lot. (*Id.* at A-8, A-65) The Pale Dog closed at around 1:00 a.m. (*Id.* at A-64)

[4]Gillisa's car was parked in the parking lot, about three rows from the Pale Dog.

When plaintiff husband arrived at the shopping center, he met Gillsa and Delisha in the parking lot. Together, they approached defendant Greene to report the groping. (*Id.* at A-9, A-24-25, A-34) Gillisa told defendant Greene what had happened and that she wanted to file a police report. (*Id.* at A-67) Greene did not respond to Gillisa; instead, he turned away in order to talk to a man about a personal matter, unrelated to police business.[5] (*Id.* at A-35, A-68)

Gillisa, Delisha and plaintiff husband walked back toward the Pale Dog to find another state trooper to report the groping. Before they could speak with an officer, the men who had groped Gillisa approached. (*Id.* at A-24, A-9) Plaintiff husband questioned the men about the groping. In response, the men cursed, threatened and taunted plaintiff husband. Plaintiff husband told Gillisa and Delisha that they were leaving and, together, they retreated toward the parking lot. (*Id.* at A-9, A-25)

Defendant Rash[6] and his K-9 partner ("Argos") were standing nearby watching these events unfold. (D.I. 47 at A-23) Defendant Rash surmised that the men were getting ready to fight. (*Id.* at A-24) Defendant Rash asked defendant Greene to stand closer to him. (*Id.* at A-23) Defendants observed plaintiff husband, Gillisa and Delisha

---

[5]Defendant Greene testified that the personal conversation was about a motorcycle he had sold to the man. (*Id.* at A-68)

[6]Defendant Rash testified that he had arrived at the Pale Dog around midnight to check on an alarm at another business in the shopping center. (D.I. 47 at A-22-23) About six other police officers were also present, including another K-9 officer. (*Id.* at A-23) Defendant Greene arrived at midnight, as well. (D.I. 52 at A-64) According to Rash, the police officers "took positions in the parking lot to control the [Pale Dog] crowd if there was going to be a crowd when the bar let out, strategically placing [themselves] throughout the parking lot to funnel out the crowd in an orderly fashion." (*Id.* at A-23) Defendants Greene and Rash were situated close to each other.

3

walk by them. Defendant Rash testified that he told them there would not be any fighting and that plaintiff husband should continue walking away from the men. (*Id.* at A-24)

As the group walked farther from the Pale Dog, the younger men continued to pursue and taunt plaintiff husband. To protect his daughter and Gilisha, plaintiff husband turned to face the men, continuing to walk backwards. (*Id.* A-9 ) One of the men punched plaintiff husband.[7] (*Id.* at A-71) Two other men joined in the attack, punching and kicking plaintiff husband.[8] (*Id.* at A-36-37; A-72) Plaintiff husband fell to the ground, lying on his back as the men continued to punch and kick him. (*Id.* at A-10, A-44, A-72, A-80) People[9] began to gather around to watch the fight. (*Id.* at A-26)

Defendant Rash commanded them to stop fighting or he would send in Argos. (D.I. 47 at A-25-26; D.I. 52 at A-78, A-87) The fight continued, moving in between parked cars. Argos was excited and barking. Defendant Rash continued to order the men to stop fighting. (D.I. 47 at A-25-26) He advised, again, that Argos would be released if the fighting did not cease. Defendants Greene and Rash (along with Argos) moved closer to the fight. Plaintiff husband was on the ground, either on his back or in

---

[7]Defendant Rash stated that he could not see who threw the first punch. (D.I. 47 at A-25) Defendant Greene testified that plaintiff husband did not throw the first punch. (D.I. 52 at A-74)

[8]Defendant Greene testified that all three men were young and undersized. (D.I. 52 at A-73)

[9]Defendant Greene testified that about forty people were leaving the Pale Dog at closing time. (D.I. 52 at A-81) In his incident report, defendant Rash wrote that there were 200 people leaving the Pale Dog at closing time. (D.I. 52 at A-82) Defendant Greene did not consider the crowd "violent." (*Id.* at A-83) Defendant Rash characterized the crowd as "violent." (*Id.* at A-82)

4

a kneeling position, as the three men continued punching and kicking him. (D.I. 52 at A-122) Defendant Rash deployed Argos. (*Id.* at A-27- A-28) Because the fighting continued, even with Argo deployed, defendant Greene[10] jumped over the hood of a parked car and pushed away the three men beating plaintiff husband. (D.I. 52 at A-72, A-79) Defendant Greene did not chase after or arrest the three men because he "didn't feel the need to" do so. (*Id.* at A-74)

Argos bit into plaintiff husband's shoulder and held him.[11] (D.I. 52 at A-14) Plaintiff husband yelled to defendant Rash to remove the dog. (*Id.* at A-10) Defendant Rash testified that plaintiff husband stood up and walked, with Argos attached and pulling his arm, toward defendant Rash. (D.I. 52 at A-116, A-118) Plaintiff husband stated that he did not stand up while Argos was holding him. (*Id.* at A-33) Defendant Rash ordered plaintiff husband to lie on the ground. (*Id.* at A-117) Defendant Rash testified that he "wanted to gain [plaintiff husband's] compliance by lying on the ground so I could remove the K-9 from him and secure him."[12] (*Id.* at A-119) Plaintiff husband continued screaming, pleading for Argos to be removed. Because plaintiff husband would not lie down, defendant Rash punched him twice in the face. As a result, plaintiff husband complied. Defendant Rash, then, ordered Argos to release his grasp.

---

[10]Defendant Greene testified that it was unnecessary to radio for assistance from other troopers because the matter was under control. (D.I. 52 at A-73)

[11]Next, Argos pulled plaintiff husband out from between the cars toward defendant Rash. (D.I. 52 at A-118)

[12]Defendant Rash testified that his preferred method to remove Argos off someone "he has bitten is to have them lie on the ground." (D.I. 52 at A-121)

5

Defendant Rash instructed defendant Greene to handcuff plaintiff husband and arrest him for disorderly conduct. (D.I. 52 at A-72) Defendant Greene believed that it was protocol, after a K-9 bit an individual, for the individual to be arrested. (*Id.* at A-80) Defendant Greene took plaintiff husband to a police vehicle to await the arrival of an ambulance. (*Id.* at A-72) Plaintiff husband was subsequently transported to the hospital for treatment of a dog bite. (D.I. 52 at A-82, A-120-121)

Plaintiff husband was charged with disorderly conduct and, subsequently, found not guilty. (*Id.* at A-119)

## III. STANDARD OF REVIEW

The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n. 10 (1986). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Federal Kemper Life Assurance Co.*, 57 F.3d 300, 302 n. 1 (3d Cir.1995) (citations omitted). In determining whether a genuine issue of material fact exists, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000) (citing *Lytle v. Household Mfg., Inc.*, 494 U.S. 545, 554–55 (1990)).

6

If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting Fed.R.Civ.P. 56(e)). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pennsylvania Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir.1995). The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## IV. DISCUSSION

### A. Eleventh Amendment

The Eleventh Amendment of the United States Constitution protects an unconsenting State or state agency from a suit brought in federal court by one of its own citizens, regardless of the relief sought. *See Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54 (1996); *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89 (1984). "[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. As such, it is no different from a suit against the State itself." *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71

7

(1989) (internal citations omitted); *Ali v. Howard,* 353 Fed. Appx. 667, 672 (3d Cir.2009) (unpublished). Accordingly, § 1983 claims for monetary damages against a State, state agency, or a state official in his official capacity are barred by the Eleventh Amendment. *See id.* The State of Delaware has neither consented to plaintiffs' suit nor waived its immunity under the Eleventh Amendment. Accordingly, the court concludes that summary judgment is appropriate for defendants State of Delaware and Delaware State Police. With respect to defendants Rash and Greene, summary judgment shall be awarded in their favor as to those claims raised against them in their official capacities.

### B. Fourth Amendment

Plaintiffs allege that defendant Rash used excessive and improper force when he: (1) released Argos to break-up the fight; and (2) punched plaintiff husband twice in the face. (D.I. 1, 52) Defendant Rash contends summary judgment is warranted because the force used was reasonable in order to arrest plaintiff and to prevent the altercation from turning into a full scale riot. (D.I. 46)

The Fourth Amendment prohibits police officers from using excessive force to arrest a suspect. *See Abraham v. Raso,* 183 F.3d 279, 288 (3d Cir. 1999). Allegations that law enforcement officers used excessive force are analyzed under the Fourth Amendment and its reasonableness standard. *Graham v. Connor,* 490 U.S. 386 (1989). "[T]he 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397; *Brower v. County of Inyo,* 489 U.S. 593, 599 (1989); *Kopec v.*

8

*Tate,* 361 F.3d 772, 777 (3d Cir. 2004). A court must assess the reasonableness of particular force "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham,* 490 U.S. at 396; *Woods v. Grant,* 665 F. Supp.2d 438, 444 (D. Del. 2009).

The reasonableness of an officer's use of force is measured by "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham,* 490 U.S. at 396. "[O]ther relevant factors include the possibility that the persons subject to the police action are themselves violent or dangerous, the duration of the action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time." *Moore v. Vangelo,* 222 Fed. Appx. 167, 170 (3d Cir.2007) (not published) (citing *Sharrar v. Felsing,* 128 F.3d 810, 822 (3d Cir.1997)).

Moreover, the use of a police dog to hold a suspect is not per se unreasonable. *Moore v. Vangelo,* 222 Fed. Appx. at 170 (3d Cir.2007) (not published) (citations omitted). "[W]hile injuries are not unusual when a police dog is used, the use of K–9 force to apprehend suspects is reasonable where the *Graham* factors weigh in favor of the police. *Foskey v. Little,* 2011 WL 3438415 at *3 (D. Del. 2011).

Considering *Graham* in light of the record at bar, the court concludes that there are genuine issues regarding facts that are material to determining whether defendant

9

Rash's actions were objectively reasonable. As is often the case when multiple individuals witness the same events, there are differences in each of the depositions of record. Nonetheless, there is consensus with respect to the following: (1) after the fight started, plaintiff was kicked and punched by three men; (2) plaintiff fell to the ground and was the target of continued kicking and punching; (3) while observing the fight, neither defendant Rash or Greene called for assistance from other law enforcement officers located close by; (4) defendant Rash deployed Argos to break up the fight; (5) Argos did not break up the fight; (6) defendant Greene broke up the fight by pushing the men off plaintiff; (7) defendant Greene did not chase after or arrest the other men; (8) after he was bitten and held by Argos, plaintiff did not attempt to escape; and (9) defendant Rash punched plaintiff twice in the face before ordering Argos to release his bite. Whether defendant Rash's actions implicate the Fourth Amendment is beyond the scope of the court's role. Rather, resolving conflicting testimony, making credibility determinations, weighing evidence, and drawing legitimate inferences from the totality of the circumstances are jury functions. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 255; *see also, Saucier v. Katz*, 533 U.S. 194, 216 (2001) (Ginsburg, J., concurring in the judgment) ("if an excessive force claim turns on which two conflicting stories best captures what happened on the street, *Graham* will not permit summary judgment in favor of the defendant official. . . . [A] trial must be had.").

### C. Malicious Prosecution

"To prevail on a malicious prosecution claim under section 1983, a plaintiff must show that: (1) the defendants initiated a criminal proceeding; (2) the criminal proceeding

10

ended in the plaintiff's favor; (3) the proceeding was initiated without probable cause; (4) the defendants acted maliciously or for a purpose other than bringing the plaintiff to justice; and (5) the plaintiff suffered deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding." See McKenna v. City of Phila., 582 F.3d 447, 461 (3d Cir. 2009).

Defendant Rash contends that summary judgment is warranted because plaintiff cannot satisfy the elements required for a malicious prosecution claim. (D.I. 46) Although he presents a thorough legal analysis, he has not buttressed the law with any supporting facts. For example, he avers:

> The plaintiff husband did not suffer any incarceration as the result of the legal proceedings in the Justice of the Peace Court. Instead, the plaintiff was found not guilty by the presiding judge. Plaintiff was issued a summons by defendant Rash and was not even required to post bail.
>
>    *    *    *
>
> There was no attorney assigned to prosecute the case so defendant Rash was required to prosecute the case on behalf of the State. The case proceeded to a full trial after which the trial judge found plaintiff husband not guilty. Since the Justice of the Peace did not dismiss at the close of the State's case, there was a prima facie case under Delaware law, 11 Del. C. § 301.

(D.I. 46 at 11-12)

Defendant Rash has presented no documentation or testimony to demonstrate the accuracy of the above statements (or any other statements presented on the malicious prosecution claim), resulting in the court lacking a factual background against which to apply the law. Considering that the court cannot accept the unsupported statements of counsel as evidence, defendant Rash's motion for summary judgment is denied. See e..g., Schoch v. First Fidelity Bancorporation, 912 F.2d 654, 657 (3d Cir.

1990); *IFC Credit Corp. v. Alliano Brothers General Contractors, Inc.*, 437 F. 3d 606, 610-611 (7th Cir. 2006).

### D. Defendant Greene

Plaintiffs aver that defendant Greene failed to intervene in several distinct ways as the events unfolded. First, plaintiffs assert that defendant Greene failed to intervene when the fight first broke out, just before Argos was released. They suggest that, if defendant had intervened before Argos was deployed, then the incident could have been prevented. Defendant Greene testified that he did not intervene before Argos was deployed, choosing instead to watch alongside defendant Rash and Argos.

As a general rule, "[a] State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *DeShaney v. Winnebago County Dep't of Soc. Services*, 489 U.S. 189, 197 (1989). The Supreme Court explained that the purpose of the Due Process Clause "was to protect the people from the State, not to ensure that the State protected them from each other." *Id.* at 195-96. Further, the Clause does not give an "affirmative right to governmental aide, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual." *Id.*

The Supreme Court has explained in this regard that "only when the State takes custody of a citizen, thereby depriving him of his liberty, that it assumes an affirmative duty to protect him or her from harm." *Bright v. Westmoreland County*, 443 F.3d 276, 280 (3d Cir. 2006). Specifically,

> [our cases] stand only for the proposition that when the State
> takes a person into its custody and holds him there

12

> against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being . . . . The affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf.

*Id.* at 280-281) (quoting *DeShaney*, 489 U.S. at 199-200).

The Third Circuit has concluded, however, that state actions which create danger or render a person more vulnerable to harm can be the basis for a Fourteenth Amendment claim. *Kneipp v. Tedder*, 95 F.3d 1199, 1205-08 (3d Cir. 1996). The elements of a state-created danger exception are:

> (1) the harm ultimately caused was foreseeable and fairly direct;
> (2) a state actor acted with a degree of culpability that shocks the conscience;
> (3) a relationship between the state and the plaintiff existed such that the plaintiff was a foreseeable victim of the defendant's acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state's actions, as opposed to a member of the public in general; and
> (4) a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all.

*Id.* at 1208; *Bright v. Westmoreland Cnty.*, 443 F.3d 276.

On this record, the court cannot conclude whether defendant Greene's conduct implicates any of the elements of the state-created danger exception. As previously noted, the inconsistencies in deposition testimony render these questions more appropriate for a jury than the court. Defendant Greene's motion is denied in this regard.

Turning to defendant Greene's conduct after the fight stopped and the interaction that occurred between plaintiff-husband and defendants Greene and Rash,

13

to establish a Fourth Amendment violation for failure to intervene, a plaintiff must establish that: (1) the police officer failed or refused to intervene when a constitutional violation took place in his or her presence or with his or her knowledge; and (2) there was a "realistic and reasonable opportunity to intervene." *See Smith v. Mensinger*, 293 F.3d 641, 650-51 (3d Cir. 2002); *Yarnall v. Mendez*, 509 F. Supp. 2d 421, 433 (D. Del. 2007). Further, it is plaintiff's burden to adduce evidence of both requirements. *Gainor v. Douglas County, Ga.*, 59 F. Supp. 2d 1259, 1289 (N. D. Ga. 1998) ("plaintiff must proffer evidence that the officer in question had a reasonable opportunity to intervene.").

The record reflect that after the fight stopped, defendant Greene turned to observe plaintiff on the ground with Argos attached to his arm and plaintiff pleading for assistance. Defendant Greene knew that plaintiff was not the initiator of the fight, but did not tell defendant Rash. The record evinces that defendant Greene: (1) watched as Argos dragged plaintiff out from between the cars; (2) watched as defendant Rash ordered plaintiff to lie on the ground; and (3) watched as plaintiff refused these commands. Moreover, defendant Greene stood by while defendant Rash punched plaintiff twice in the face (while Argos was attached) and did not order Argos to release until after plaintiff-husband submitted. Defendant Greene complied with defendant Rash's orders to handcuff and arrest plaintiff for disorderly conduct, despite knowing that plaintiff was not the initiator and that the other men were not charged. On this record, the court concludes that a reasonable jury could find that defendant Greene knew that plaintiff's rights were violated and that he had a reasonable opportunity to act. Defendant Greene's motion is denied in this regard.

With regard to plaintiffs' assertion that defendant Greene's failure to assist and investigate Gillisa's complaint about what happened in the Pale Dog, there is no dispute that defendant Greene ignored her requests for help. This claim fails, however, since plaintiffs lack standing to assert a failure to intervene claim on Gillisa's behalf. See *Nasir v. Morgan*, 350 F.3d 366, 376 (3d Cir. 2003).

### E. Conspiracy

Defendants aver that plaintiffs' conspiracy claim fails because they have presented no authority or evidentiary support for the bare allegations. The court agrees. Although plaintiffs argue that the evidence of record establishes a conspiracy between defendants Greene and Rash to cover up their improper use of force, they have not cited to any specific part of the record nor advanced any legal authority to buttress this broad claim. "[T]he court is not obliged to scour the record to find evidence that will support a party's claims." *Perkins v. City of Elizabeth*, 412 Fed. Appx. 554, 555 (3d Cir. 2011) (unpublished); *see also Holland v. New Jersey Dep't of Corr.*, 246 F.3d 267, 285 (3d Cir. 2001).

### F. Qualified Immunity

State officials performing discretionary duties are generally "shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). For a federal right to be "clearly established" for purposes of qualified immunity, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he [or she] is doing violates that right."

15

*Anderson v. Creighton*, 483 U.S. 635, 640 (1987); *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). Given there remain material factual disputes, it is inappropriate to grant summary judgment on the issue of qualified immunity. *See Curley v. Klem*, 499 F. 3d 199, 208, 211 n.12 (3d Cir. 2007).

## V. CONCLUSION

For the reasons discussed, defendants' motion for summary judgment is granted in part and denied in part. An order shall issue.